No. 103,093

STATE OF KANSAS, *Appellee*, v. ANDRAY S. CAMERON, *Appellant*.

(281 P.3d 143)

Opinion filed July 27, 2012.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause, and *Theresa L. Barr*, of the same office, was with her on the briefs for appellant.

*Natalie A. Chalmers*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: As required by K.S.A. 22-3717(d)(1)(G), the district court in this case sentenced Andray S. Cameron, in part, to lifetime postrelease supervision for his convictions of three counts of aggravated indecent solicitation of a child. On appeal, Cameron argues his sentence to lifetime postrelease supervision is a disproportionate and cruel and/or unusual punishment that violates § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. Cameron also argues the district court erred by not recognizing the court had the discretion to sentence him to a shorter postrelease supervision term of 24 months under a different statutory subsection, K.S.A. 22-3717(d)(1)(B).

We reject Cameron's arguments regarding the constitutionality of his sentence, concluding the lifetime postrelease supervision sentence is not disproportionate to the seriousness of Cameron's crime, is not grossly disproportionate to the sentences imposed for other crimes in Kansas or similar crimes in other states, and is not categorically unconstitutional. We also reject his argument that the district court had discretion to sentence him to a postrelease supervision term of 24 months, finding there is no reasonable doubt that the Kansas Legislature intended the more severe penalty of lifetime postrelease supervision must be imposed when a defendant is sentenced for a sexually violent crime. Consequently, we affirm Cameron's sentence.

## FACTS AND PROCEDURAL BACKGROUND

Cameron pleaded guilty to three counts of aggravated indecent solicitation of a child, in violation of K.S.A. 21-3511(a), a severity level 5 person felony. A person commits aggravated indecent solicitation of a child by "[e]nticing or soliciting a child under the age of 14 years to commit or to submit to an unlawful sexual act." K.S.A. 21-3511(a).

Under the facts of this case, 45-year-old Cameron was married to the victim's biological grandmother, making him the stepgrandfather of the 12-year-old female victim. According to the factual statement offered by the State as the basis for the plea, Cameron's wife was "raising" the victim at the time of the incident. The State proffered that the victim told her grandmother that Cameron "put his thing up and down on her butt, soliciting her to engage in acts of an unlawful sexual nature, those acts being—act of sexual intercourse, and an act of criminal sodomy, and an act of lewd fondling of [the victim.]" The State also proffered that Cameron admitted to police that he had been drinking heavily. Cameron, after initially denying the allegations, in a second interview "confessed to waking up with an erect penis and pressing that against the back side of [the victim] and soliciting her for the sex acts described previously." The district court accepted Cameron's plea and found him guilty of three counts of aggravated indecent solicitation involving enticement to commit or submit to sexual intercourse, sodomy, and lewd fondling or touching.

As part of the plea agreement, it was agreed that Cameron would be sentenced to 24 months' postrelease supervision. The district court determined, however, it could not follow the plea agreement because K.S.A. 22-3717(d)(1)(G) expressly mandates lifetime postrelease supervision for sexually violent offenders; Cameron's offense meant he fell within the mandate. The court offered Cameron the opportunity to withdraw his guilty plea, but Cameron decided not to withdraw his plea and instead chose to ask that the plea agreement be enforced. Cameron also filed a motion requesting a downward departure from lifetime postrelease supervision and a motion arguing lifetime postrelease supervision was cruel

and/or unusual punishment under the Kansas Constitution and the United States Constitution. Cameron's motion was essentially the same as that of the defendant in *State v. Mossman*, No. 103,111 (this day decided), who was represented by the same trial counsel.

Specifically, Cameron noted that K.S.A. 22-3717(d)(1)(G) provides that an individual convicted of a sexually violent crime committed on or after July 1, 2006, who is released from prison "shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life." An individual sentenced to lifetime imprisonment under K.S.A. 21-4643 is excepted from this requirement. Included in the definition of sexually violent crimes is the crime of aggravated indecent solicitation of a child, Cameron's crime of conviction in all three counts in this case. See K.S.A. 22-3717(d)(2)(G).

Mandatory lifetime postrelease supervision includes a general requirement that the person cannot commit a new criminal offense and may include several other specific "conditions targeted toward facilitating rehabilitation, restitution, and safe reintegration into society. [Citation omitted.]" *State v. Gaudina*, 284 Kan. 354, 359, 160 P.3d 854 (2007). These conditions may include payment of costs, fines, and restitution; completing educational requirements; performing community service; reporting to a supervising officer; and abiding by other special conditions allowed by administrative regulations and orders. K.S.A. 21-4703(p) (defining "postrelease supervision"); K.S.A. 22-3717(m) (listing possible conditions). In addition to discussing these general conditions, Cameron, in his motion, stressed the potential of life in prison if he violates his postrelease conditions by committing a new felony. See K.S.A. 75-5217(c) ("upon revocation [of postrelease supervision], the inmate shall serve the entire remaining balance of the period of postrelease supervision"). Both the restrictions that accompany lifetime postrelease supervision and the potential for life in prison, Cameron argued in his motion, makes the sentence disproportionate.

At sentencing, the district court denied Cameron's motion for a sentencing departure. In addition, citing *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978), the district court rejected

Cameron's contention that lifetime postrelease supervision is unconstitutional.

On appeal, Cameron renews his argument that lifetime postrelease supervision constitutes cruel and/or unusual punishment under § 9 of the Kansas Constitution Bill of Rights and the Eighth Amendment to the United States Constitution. Although in this appeal, Cameron has different counsel than Mossman's appellate counsel, Cameron's arguments are very similar to those asserted by Mossman. However, Cameron does make the additional argument that the district court had the discretion to sentence him to a shorter postrelease supervision term under a different statutory provision.

This court transferred Cameron's case from the Court of Appeals pursuant to K.S.A. 20-3018(c) (transfer on court's own motion), along with Mossman's appeal. At the time of the transfer and in light of Cameron's challenge under the Eighth Amendment's ban on cruel and unusual punishment, this court directed the parties to file "supplemental briefs addressing whether the categorical analysis set out in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), which was decided after [Cameron's] briefs were submitted, should apply." The State's brief in this appeal and in Mossman's appeal were filed by the Shawnee County District Attorney's office and made similar arguments in both appeals. As a result, the legal arguments in this case are essentially the same as those considered in *Mossman* and it is only the factual circumstances of the two cases that are distinguishable. See *Mossman*, 294 Kan. at 903-04.

### § 9 OF THE KANSAS CONSTITUTION BILL OF RIGHTS

With that in mind, we first turn to Cameron's argument that his lifetime postrelease supervision sentence, imposed pursuant to K.S.A. 22-3717(d)(1)(G), violates § 9 of the Kansas Constitution Bill of Rights. In *Mossman*, we determined the applicable standard of review for this issue, stating:

"[I]n deciding whether a sentence is cruel or unusual under § 9 of the Kansas Constitution Bill of Rights, a district court must make both legal and factual determinations. [Citation omitted.] When the district court's decision is appealed,

an appellate court applies a bifurcated standard of review: All of the evidence is reviewed, but not reweighed, to determine if there is sufficient support for the district court's factual findings, and the district court's legal conclusions drawn from those facts are reviewed de novo. [Citations omitted.]" *Mossman*, 294 Kan. at 906.

We also explained in *Mossman* that "[b]oth a district court making the initial determination regarding whether a statute is constitutional and an appellate court conducting a review of that determination are required by the separation of powers doctrine to presume the statute is constitutional." This means, we explained, that "if there is any reasonable way to construe a statute as constitutional, courts have the duty to do so by resolving all doubts in favor of constitutionality. [Citations omitted.]" *Mossman*, 294 Kan. at 906-07.

This presumption arises from the separation of powers doctrine, which also imposes a limitation on courts by prohibiting judicial resolution of issues that are not ripe for decision. Although recognizing the requirement of ripeness, in *Mossman* we rejected the State's argument that a defendant's arguments regarding the constitutionality of lifetime postrelease supervision are not ripe for decision on direct appeal. We reached this conclusion because,

"[e]ven though the supervision will not begin until sometime in the future after the defendant has completed a term of imprisonment and no one knows exactly what conditions will be imposed on the defendant at that time, the claim is ripe because the postrelease supervision term is part of the sentencing judgment and it is known that the defendant's rights and liberties will be restricted in some manner." *Mossman*, 294 Kan. 901, Syl. ¶ 3.

In light of that conclusion, we considered Mossman's arguments, and likewise can consider those made by Cameron.

Freeman *Factors*

Cameron's arguments regarding constitutionality under § 9 of the Kansas Constitution Bill of Rights are framed by this court's decision in *Freeman*. In that decision, this court recognized: "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Freeman*, 223 Kan. at 367.

This court set out a three-part test to aid in administering this principle, stating:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman*, 223 Kan. at 367.

Accord *State v. Levy*, 292 Kan. 379, 384-85, 253 P.3d 341 (2011); *State v. Reyna*, 290 Kan. 666, 689, 234 P.3d 761, *cert. denied* 131 S. Ct. 532 (2010); *State v. Mondragon*, 289 Kan. 1158, 1162-63, 220 P.3d 369 (2009).

No one factor controls. "Ultimately, one consideration may weigh so heavily that it directs the final conclusion," but "consideration should be given to each prong of the test." *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008). Particularly where the focus of an argument is proportionality, which is the focus of Cameron's arguments, "the factual aspects are a necessary part of the overall analysis." *Ortega-Cadelan*, 287 Kan. at 161. Further, this court has stated that the use of these factors is disfavored if analyzing any aspect of a criminal sentence other than its length. See *State v. Kleypas*, 272 Kan. 894, 1032-33, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

- *First* Freeman *Factor*

With regard to the first *Freeman* factor—nature of the offense and the character of the offender—Cameron, in his written brief to the district court, pointed to facts particular to this case:

"The nature of the offense involved [Cameron's] soliciting his 12-year-old step-grand-daughter to commit or submit to three different sex acts on one occasion.

He spoke not once, but twice to law enforcement about it and showed remorse. He immediately went into inpatient alcohol treatment at his own expense. He was 46 years old [*sic*] with no prior felony record. He had held a job with Goodyear for many years."

At the motions hearing, Cameron also pointed the district court to the report of Dr. George Hough for evidence regarding the nature of the offense and Cameron's character. It appears from the record that Dr. Hough was a psychologist who evaluated Cameron, but Dr. Hough's report was not included in the record on appeal.

With regard to the first *Freeman* factor, the district judge made the following findings on the record:

"[T]he circumstances of the case appear to be that Mr. Cameron did engage in some sort of unlawful activity with a child. She was I think 11, close to 12, when it occurred. He was extremely intoxicated, according to his statements, at the time. . . . [H]is version of the events was mirrored in his statements to Dr. Hough and to law enforcement officers . . . in several statements.

"Mr. Cameron was totally cooperative with law enforcement. Had he not given statements, this case would have been substantially more difficult to prove, because, of course, it would have necessitated the testimony of the victim.

"Mr. Cameron did choose to accept responsibility for his actions as part of his treatment program.

. . . .

". . . [T]he Court does note that [Dr. Hough's] report did contain information assessing Mr. Cameron's risk levels to the community, risk for reoffending, et cetera. And his numbers were all very low for risk of future type of sexual offense. That he . . . is not attracted to young children. His . . . sexual preferences and attractions are to adult females.

"There was, of course, the alcohol, which was a primary element to the intent in this case, or according to Dr. Hough.

"But the point is, on this case, that the nature of the offense, even what he agreed to plead to, the lesser offense, were clearly offenses that fall within those offenses . . . provided by statute to be addressed by Jessica's Law."

On appeal, Cameron makes no attempt to argue how the first *Freeman* factor should be analyzed under his particular facts or how the district court's findings should impact his appeal. Instead, he merely argues that the district court's "analysis was insufficient." It is unclear why Cameron would characterize those findings as insufficient, and Cameron's counsel was unable to identify insuf-

ficiencies when asked to do so during oral argument. The findings address the components outlined in the first *Freeman* factor, and we find them sufficient for appellate review.

As Cameron admits, his crime involved activities with a 12-year-old girl, who was his stepgranddaughter. Although alcohol was viewed as a significant causative factor, more so than a proclivity to engage in sexual activities with a child, there is no question that the crime is very serious and one that can create significant psychological harm. Substantial competent evidence supports the district court's findings relating to the first *Freeman* factor, and we will not reweigh that evidence. In turn, the district court's factual findings support its legal conclusion that the first *Freeman* factor does not weigh in Cameron's favor.

Moreover, Cameron's failure to adequately brief the issue constitutes a waiver of any arguments regarding the first *Freeman* factor. See *State v. Raskie*, 293 Kan. 906, Syl. ¶ 5, 269 P.3d 1268 (2012). Nevertheless, we must address the other *Freeman* factors.

- *Second* Freeman *Factor*

Under the second *Freeman* factor—comparison of his punishment with punishments imposed in this jurisdiction for more serious offenses—Cameron argued in his presentencing motion, as he does on appeal, that his lifetime postrelease supervision sentence is disproportionate to other sentences in Kansas. He provides the example of intentional second-degree murder, which carries a longer prison sentence but carries a shorter postrelease supervision term of only 36 months. Cameron also provided the sole example of second-degree murder at the motions hearing before the district court. See K.S.A. 21-3402 (intentional second-degree murder is a severity level 1 person felony); K.S.A. 21-4704(a) (for a severity level 1 person felony, presumptive prison sentence with criminal history score of "I" is 165-155-147 months' incarceration; presumptive prison sentence with criminal history score of "H" is 186-176-166 months' incarceration); K.S.A. 22-3717(d)(1)(A) (36 months' postrelease supervision). Although the district court did not specifically address the disproportionality of the sentence as compared to one imposed for second-degree murder, the judge

concluded: "I'm without specific evidence to show that application of the law in this case would be disproportionate to . . . other sentences imposed within this jurisdiction."

This same argument was discussed in *Mossman*. There, we concluded that while a defendant·subject to lifetime postrelease supervision is under a longer cumulative sentence than a defendant sentenced for second-degree murder, a "sentence to lifetime postrelease supervision [for a sexually violent offense] is not grossly disproportionate in relation to the sentence applicable to second-degree murder in Kansas when we consider the penological purposes, the seriousness of the crime, and the other concerns discussed in relation to the first *Freeman* factor." *Mossman*, 294 Kan. at 917. In other words, the difference in proportionality between Cameron's sentence, especially in light of the factual circumstances, and one imposed for second-degree murder is not so significant that the second *Freeman* factor outweighs the first *Freeman* factor.

But, we still must evaluate this conclusion in light of the third *Freeman* factor.

- *Third* Freeman *Factor*

Under the third *Freeman* factor—comparison of the penalty with punishments in other jurisdictions for the same offense—Cameron made the general acknowledgment in his presentencing motion and at the motions hearing that many states have passed some form of "Jessica's Law." He argued in his written motion that this did not foreclose his requested relief because "in *Ortega-Cadelan*, 287 Kan. 157, . . . the Court said, 'Ultimately, one consideration may weigh so heavily that it directs the final conclusion.' Not all three *Freeman* factors need to be found to find the sentence unconstitutional." And in Cameron's arguments at the motions hearing, he also pointed to Massachusetts as an example of a state that changed its laws to allow district courts to exercise discretion in deciding whether "to impose the life time" sentence. See Mass. Gen. L. ch. 265, § 45 (2010) (some enumerated sex offenders "may" be sentenced to lifetime parole supervision; others "shall" be sentenced to lifetime parole supervision).

The district court summarily rejected these arguments, concluding it did not "have sufficient information to show that application in this case would be disproportionate to the application in other jurisdictions." On appeal, Cameron cites to the limited use of postrelease supervision in other states for crimes similar to aggravated indecent solicitation of a child.

Essentially the same arguments regarding the third *Freeman* factor were presented in *Mossman*. If anything, Cameron presents a weaker argument because he admits six other states impose mandatory lifetime postrelease supervision in cases involving crimes like Kansas' aggravated indecent solicitation of a child. See Colo. Rev. Stat. § 18-1.3-1001 (2011) (Colorado); Mont. Code Ann. § 45-5-625(4)(b) (2011) (Montana); Nev. Rev. Stat. §§ 176.0931, 179D.097 (2011) (Nevada); N.J. Stat. Ann. § 2C:43-6.4(a), (c) (2005) (New Jersey); Okla. Stat. tit. 22, § 991a (A)(13); tit. 57, § 584 (N)(2) (2011) (Oklahoma); Utah Code Ann. § 76-3-202(3)(a) (2008) (Utah). In contrast, in *Mossman*, only three states had the same mandatory requirement for a crime comparable to aggravated indecent liberties with a child, although several states had similar provisions or made for discretionary imposition of lifetime postrelease supervision for crimes like that committed by Mossman. See, *e.g.*, Or. Rev. Stat. §§ 144.103(2), 163.375(1)(c) (2011).

While we find some merit to Cameron's arguments that only a minority of states impose a similar punishment, the lifetime postrelease supervision sentence is proportionate to sentences mandated in some other jurisdictions and is not grossly disproportionate in light of the strength of the first *Freeman* factor. As we held in *Mossman*:

"Under the facts of this case, a defendant's sentence of lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G) for the crime of aggravated indecent liberties with a child is not cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights; in other words, it is not so disproportionate to the crime that it shocks the conscience and offends fundamental notions of human dignity. Factors leading to this conclusion include: the nature of the offense, which is serious and is a sex crime against a minor that historically has been treated as a forcible or violent felony regardless of whether there is physical force; the defendant's characteristics; and the penological goals of postrelease supervision, which include retribution, deterrence, incapacitation, and rehabilitation. These

factors outweigh the lack of strict proportionality with other sentences in Kansas and other jurisdictions, especially given that the sentence is not grossly disproportionate." *Mossman*, 294 Kan. 901, Syl. ¶ 5.

For these same reasons, Cameron's sentence for the crime of aggravated indecent solicitation of a child does not violate § 9 of the Kansas Constitution Bill of Rights.

## EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Next, Cameron argues his lifetime postrelease supervision sentence violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the Unites States Constitution. Under *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), a challenge pursuant to the Eighth Amendment to a term-of-years sentence as disproportionate and therefore cruel and unusual punishment falls into one of two general classifications. "The first [category] involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Graham*, 130 S. Ct. at 2021; see *State v. Gomez*, 290 Kan. 858, 863-66, 235 P.3d 1203 (2010) (discussing *Graham*). These two classifications will be discussed separately.

### 1. *Case-Specific Proportionality Challenge*

With regard to the first federal classification—involving a case-specific proportionality analysis—in *Mossman*, we held this issue involves the same standard of appellate review as applies to the application of the *Freeman* factors. As opposed to the district court which decided Mossman's motions and considered pre-*Graham* Eighth Amendment decisions, the district court in this case did not specifically address the Eighth Amendment. Nevertheless, Cameron does not suggest any reason why our application of the *Freeman* factors would not control the case-specific considerations under the Eighth Amendment. Cameron argues the Kansas Constitution provides him broader protection than does the Eighth Amendment. In contrast, he does not suggest any basis for finding case-specific disproportionality under the Eighth Amendment to

the United States Constitution if we have rejected such an argument under § 9 of the Kansas Constitution Bill of Rights.

Further, as we noted in *Mossman*, the United States Supreme Court has emphasized that it is only the rare case where the threshold comparison of the gravity of the offense and the harshness of the penalty will lead to an inference of gross disproportionality. *Mossman*, 294 Kan. at 922-23 (citing *Graham*, 130 S. Ct. at 2022). This case is not such a rare case given the severity of the crime. Moreover, while the sentence is lengthy, lifetime postrelease supervision is not as harsh a punishment as imprisonment and is aimed at safely integrating a sex offender into society and protecting the public. Given the seriousness of the offense, the vulnerability of Cameron's victim, the potential psychological damage to the victim, and the penological goals of postrelease supervision, we conclude Cameron's case-specific arguments are unavailing.

## 2. *Categorical Proportionality Challenge*

In response to this court's order for supplemental briefing, Cameron also takes a broader approach by asserting that the second federal classification—a categorical proportionality—leads to the conclusion that lifetime postrelease supervision imposed for a certain class of offenders is cruel and unusual punishment under the Eighth Amendment to the United States Constitution. In *Graham*, the Court indicated its earlier decisions had considered two categorical subsets in the context of its death penalty cases: one related to the nature of the offense, the other to the characteristics of the offender. *Graham*, 130 S. Ct. at 2022.

Cameron describes this class of offenders as those who have committed "a sex offense, not involving pornography, where the offender and the victim do not engage in physical contact, much less a physical sexual act." The State argues that Cameron tries to name a much too narrow class of offenders and that by making such a narrow and specific class at issue, Cameron essentially makes a "thinly veiled attempt at a second chance at the *Freeman* analysis." The State also asserts that Cameron is not even a member of his proposed class of offenders in that "Cameron pled guilty to the act of placing his penis on a 12-year-old child's buttocks along

with other acts of solicitation." In response to this latter point made by the State, Cameron argues: "Although the statement that Mr. Cameron pressed his penis against 'the back side of J.M.' was included in the State's factual basis [at the plea hearing], this was not an element of the charged crime."

Regardless of the factual basis of the plea, as we held in *Mossman*, we do not find a basis for considering a classification of an offense that is any narrower than the crime of conviction—aggravated indecent solicitation of a child. See *Mossman*, 294 Kan. at 929 (concluding category for analysis was crime of conviction, which in that case was aggravated indecent liberties with a child). Consideration of categorical challenges, we held in *Mossman*, presents an issue of law subject to unlimited review. *Mossman*, 294 Kan. at 925.

In *Mossman*, we rejected a categorical argument relying on *United States v. Williams*, 636 F.3d 1229 (9th Cir.), *cert. denied* 132 S. Ct. 188 (2011). In *Williams*, the Ninth Circuit Court of Appeals considered whether lifetime supervised release for child pornography was cruel and unusual punishment. In rejecting the constitutional challenge, the court stated:

"Here, 'objective indicia' suggest that society is comfortable with lifetime sentences of supervised release for sex offenders, as such sentences are common. According to the United States Sentencing Commission, in the last five years, federal courts have sentenced 1875 defendants convicted of child pornography and child prostitution crimes to lifetime supervised release. See U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release 58-59 (July 2010), www.ussc.gov/general/20100722_Supervised_Release.pdf. By way of comparison, in banning the sentence of life without parole for juvenile nonhomicide offenders, the Supreme Court noted that there were then just 123 people in the county serving such sentences. See *Graham*, 130 S. Ct. at 2024. Further, the percentage of federal sex offenders receiving life terms of supervised release is increasing, climbing from 9.3 percent in 2005, to 20.5 percent in 2009. [Citation omitted.]" *Williams*, 636 F.3d at 1233-34.

In addition, as we have previously discussed here and in *Mossman*, several other states have adopted lifetime postrelease supervision for many, if not, all sexually violent crimes. *Mossman*, slip op. at 20-22. Hence, the numbers cited in *Williams* do not reflect the total number of sex offenders subject to lifetime postrelease supervision. ·

The *Williams* court next exercised its " 'independent judgment' " by considering " 'whether the challenged sentencing practice serves legitimate penological goals.' " *Williams*, 636 F.3d at 1234 (quoting *Graham*, 130 S. Ct. at 2026). The *Williams* court noted that the goals of rehabilitation and incapacitation "are central purposes of the criminal justice system, and they are particularly critical here given the propensity of sex offenders to strike again." More specifically, the court noted: "Supervised release can further the end of rehabilitating sex offenders. . . . Relatedly, supervised release helps incapacitate sex offenders by keeping them under the watchful eye of probation officers who may be able to detect problems before they result in irreparable harm to innocent children." *Williams*, 636 F.3d at 1234.

The Ninth Circuit's conclusion applies equally to those sentenced in Kansas to postrelease supervision for the crime of aggravated indecent solicitation of a child.

As a result, we hold that Cameron's sentence of lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G) for his conviction of aggravated indecent solicitation of a child is not categorically disproportionate and, therefore, is not cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

### K.S.A. 22-3717(d)(1)(B)

Finally, Cameron argues that the district court erred in imposing lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G) because the court had the authority and discretion to sentence him to a shorter postrelease supervision term, 24 months, under a different statutory subsection, K.S.A. 22-3717(d)(1)(B). This issue requires us to construe K.S.A. 22-3717(d)(1), and this task presents a question of law over which this court exercises unlimited review. See *State v. Sellers*, 292 Kan. 346, 356, 253 P.3d 20 (2011); *State v. Ballard*, 289 Kan. 1000, 1010, 218 P.3d 432 (2009).

The subsection of K.S.A. 22-3717 on which Cameron relies, (d)(1)(B), provides:

"Except as provided in subparagraphs (D) and (E), persons sentenced for nondrug severity levels 5 and 6 crimes and drug severity level 3 crimes must serve 24

months, plus the amount of good time and program credit earned and retained pursuant to K.S.A. 21-4722, and amendments thereto, on postrelease supervision."

Cameron acknowledges that his offense also falls under K.S.A. 22-3717(d)(1)(G), which requires an offender convicted of a "sexually violent crime" committed after July 1, 2006, to receive lifetime postrelease supervision upon release from prison. "Sexually violent crime" includes aggravated indecent solicitation with a child under K.S.A. 21-3511. See K.S.A. 22-3717(d)(2)(G). But Cameron argues that both subparagraphs of subsection (d)(1)—(d)(1)(B) and (d)(1)(G)—apply because both are listed in the statute and the language in (d)(1)(B) does not create an exception for offenses falling under (d)(1)(G). He essentially contends the rule of lenity requires the lesser of the two postrelease supervision terms.

A similar argument was considered in *State v. Chavez*, 292 Kan. 464, 254 P.3d 539 (2011), in which the defendant sought the application of the more lenient sentencing provisions of one subparagraph of a statute's subsection rather than a harsher penalty in the same subsection. As in this case, the more lenient provision was more general and the harsher provision was more specific. The court noted that the circumstance of having to "reconcile two provisions within the same subsection of the same statute . . . triggers a responsibility that this court consider the various provisions of the act *in pari materia* with a view of reconciling and bringing the provisions into workable harmony, if possible. [Citation omitted.]" *Chavez*, 292 Kan. at 467. Discussing the rules of strict construction and lenity that apply to the construction of ambiguous criminal statutes, the *Chavez* court noted: "[T]he general rule of strict construction of criminal statutes is constrained by the rule that the interpretation must be reasonable and sensible to effect legislative design and intent. [Citation omitted.] Moreover, the rule of lenity is subject to the existence of 'any reasonable doubt' as to the statute's meaning." *Chavez*, 292 Kan. at 468. In part because of the specific language of one subparagraph as compared to the more general language of the other subparagraph, the court concluded there could be no reasonable doubt that the legislature intended for the more specific and severe penalty to apply. *Chavez*, 292 Kan.

at 468; see also *State v. Martinez*, 290 Kan. 992, 1001, 236 P.3d 481 (2010) (citing *In re K.M.H.*, 285 Kan. 53, 82, 169 P.3d 1025 [2007], *cert. denied* 555 U.S. 937 [2008]) (indicating a specific provision within a statute controls over a more general provision within the statute).

Likewise, when we consider the provisions of K.S.A. 22-3717(d)(1) *in pari materia* with a view of reconciling and bringing the provisions into workable harmony there is no reasonable doubt that the legislature intended the more specific and more severe provision of (d)(1)(G) to apply to a sentence imposed for a conviction of a sexually violent offense rather than the more general provision of (d)(1)(B) that Cameron seeks to apply. This means that an offender convicted of a "sexually violent crime" committed after July 1, 2006, must be sentenced to receive lifetime postrelease supervision upon release from prison.

The district court did not err in imposing lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G).

Affirmed.